IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

WILLIAM PHILPOT,    }
                    }
    Plaintiff,      }
                    }
v.                  }                Case No.:  CV-02-P-3154-S
                    }
NATIONSRENT USA, INC. and    }
WAYNE CORNELIUS,    }
                    }
    Defendants.     }

**ENTERED**

OCT 1 5 2004

## MEMORANDUM OPINION

The court has before it Defendants' Motion for Summary Judgment (Doc. # 70). The motion

is fully briefed and was under submission, without oral argument, as of April 13, 2004. (Doc. # 64).

Plaintiff William Philpot ("Plaintiff") alleges that NationsRent USA, Inc. ("NationsRent") and

Wayne Cornelius ("Cornelius")(collectively "Defendants") wrongfully terminated his employment

and retaliated against him in violation of the Family Medical Leave Act of 1993 ("FMLA") for

requesting and taking medical leave. Plaintiff also alleges that NationsRent discriminated and

retaliated against him in violation of the Americans with Disabilities Act ("ADA"). For the reasons

outlined below, Defendants' Motion for Summary Judgment is due to be granted because there are

no disputed issues of material fact and Defendants have demonstrated that they are entitled to

judgment as a matter of law.[1]

## I.    Legal Standards for Evaluating a Summary Judgment Motion

Summary judgment is proper only when there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law. Fed. R .Civ. P. 56(c). All reasonable doubts

---

[1] Also pending before the court is Defendants' motion to strike portions of Bobby Lyle's and
Glen Shepherd's declarations. (Doc. # 84). This motion is due to be denied.

about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-08 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 123 S. Ct. 2148 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).[2]

_____

[2] Here, Plaintiff has presented only circumstantial evidence of discrimination. (Doc. # 50, at 5-6). Although Plaintiff contends that he was subjected to offensive comments related to his disability while employed at NationsRent, these do not rise to the level of direct evidence. Plaintiff points to an isolated comment by Cornelius that Plaintiff "hop on over here" or "hobble on over here." (Pl. Dep. at 95). Although Plaintiff claims in his opposition brief that this alleged statement was made "in front of other employees and arguably customers" (Doc. # 77, at 4), there is no such evidence in the record. This alleged isolated comment, made months prior to Plaintiff's termination and without any nexus to the issues in the case, is not direct evidence. *Standard v. A.B.E.L., Inc.*, 161 F.3d 1318, 1329 (11th Cir. 1998); *see also Allen v. City of Athens*, 937 F.Supp. 1531 (N.D. Ala. 1996) (finding that stray comments unrelated to decisional process are not evidence of discrimination). That Cornelius discussed Plaintiff's disability and need to attend physical therapy sessions with other managers and Cornelius' request that Plaintiff be "more visible" when the store was having difficulty are likewise not direct evidence of discrimination because they are subject to more than one interpretation. *Harris v. Shelby County Bd. of Educ.*, 99 F.3d 1078, 1083 n. 2 (11th

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving

by a preponderance of evidence a *prima facie* case of discrimination.   Second, once the plaintiff

proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate,

nondiscriminatory reason for its employment decision.   Finally, if the defendant carries its burden,

the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered

by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type,

for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment

action, even though defendant's legitimate reason may also be true or have played some role in the

decision. *McDonnell Douglas*, 411 U.S. at 801-02; *Burdine*, 450 U.S. at 251-54; *Desert Palace*,

123 S. Ct. at 2154-55.

## II.   Relevant Undisputed Facts

### A.   NationsRent

Defendant NationsRent is a full service equipment rental company serving a broad range of

industrial and construction clients, primarily through retail stores. (Cornelius Dec. at ¶ 2).   Since

November 2001, Defendant Wayne Cornelius has been the district manager for the Alabama-Florida

Panhandle region and is responsible for the performance of the stores in his district. (Cornelius Dep.

at 27, 29-30, 37-39).   Cornelius' office is located at NationsRent's Birmingham store; accordingly,

---

Cir.1996) (holding that statement open to more than one interpretation was not direct evidence).
Finally, Plaintiff's argument that other store employees allegedly made disparaging comments to
Plaintiff (*see e.g.,* Declaration of Bobby Lyle at ¶¶ 15-17), is immaterial given that those employees
were not involved in Plaintiff's termination or the administration of leave to him, and there is no
evidence that any decisionmakers were aware of these comments. *A.B.E.L.*, 161 F.3d at 1330
("[R]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are
not direct evidence of discrimination."). Moreover, Plaintiff admittedly never complained to anyone
in management or human resources about them. (Pl. Dep. at 93).

he spends approximately two days a week in that store – more time than any other store within his district. (Cornelius Dep. at 27, 79-80, 92). When Cornelius became district manager, he observed that the Birmingham, Montgomery, and Troy stores were the poorest performing in his district. (Cornelius Dep. at 72).

### B.    Plaintiff's Employment with NationsRent

Plaintiff began working for NationsRent as a Store Manager in Pelham, Alabama on July 17, 2000. (Philpot Dep. at 18-19, 37, 51-52, 55, Ex. 3). Plaintiff continued to work as manager of the Pelham store until his transfer as a salaried manager to NationsRent's Birmingham location in May or June 2001. (Philpot Dep. at 55).

At the outset of his employment, Plaintiff received a copy of NationsRent's employee handbook, which included NationsRent's Family and Medical Leave Act and No Harassment Policies. (Philpot Dep. at 67-68, Exs. 4-5; Doc. # 73, Exs. D, E).   As a manager, Plaintiff was responsible for enforcing the Company's policies, keeping up the store's financial performance and appearance, and supervising the store's personnel.  (Philpot Dep. at 19-22, 55-56, 92, Ex. 2).[3] Plaintiff described his significant responsibilities as manager of the Birmingham store as follows: "Duties include managing and supervising 26-30 employees, which include inside and outside sales, shop supervisor, dispatch supervisor and their employees. Responsible for rental and maintenance of $10M fleet, also responsible for $20-30,000 in merchandise inventory, maintaining and

---

[3] The job description for Store Manager, which Plaintiff received and agreed was accurate, states that the Store Manager is responsible for "the overall operation of the store location, including revenue, profit and loss, management of store staff members, facilities and equipment." (Philpot Dep. at 36-38 and Ex. 2).

replenishing stock levels. Also to manage and control profit/loss statement expenses as well as payroll." (Doc. # 78, Ex. K).

The Birmingham store was a "hub" store, meaning that it provided equipment and repair assistance to outlying satellite stores. (Philpot Dep. at 60, 62; Cornelius Dep. at 42). The manager of the Birmingham store has greater responsibilities than satellite stores (like the Pelham store) because he has a larger fleet of equipment and more employees to manage. (Philpot Dep. at 60). Moreover, because of the support that hub stores provide to other stores, it is particularly important for the hub to inventory and repair equipment in an expeditious and organized manner, thereby ensuring that the equipment is available for the use of both hub and satellite stores. (Cornelius Declaration at ¶ 8). At the time Plaintiff became manager of the Birmingham store, it had a large "in-shop" list, meaning that there was a large quantity of equipment that needed to be repaired and therefore could not be rented. (Philpot Dep. at 66).

### C.    Plaintiff's Motorcycle Accident and Resulting Injury

On July 28, 2001, Plaintiff was involved in a motorcycle accident which resulted in serious injuries to his left foot and leg and caused him to be hospitalized for one month. (Philpot Dep. at 77-79, 87).[4]    While in the hospital, Birmingham store employees sent Plaintiff a Total Rental Revenue Sheet, circling the projected revenue for July 2001 and telling Plaintiff to get well soon.

---

[4] Plaintiff sustained numerous severe injuries, including but not limited to, a left femur fracture (rod and femur), left patella fracture (dislocation), amputation of the distal phlax of the left hand, dislocation of the left ankle with a large tissue defect, blunt abdominal trauma, extensive orthopaedic damage to his left leg, and a degloving injury to his left foot. (Pl. Dep. at 78; Doc. # 78, Ex. K). Since the accident, Plaintiff has undergone numerous surgeries, including but not limited to debridement surgeries involving skin and bones, skin grafts to the left leg and foot, and abdominal surgery. (Doc. # 78, Ex. K).

(Doc. # 78, Ex. L).  NationsRent's managers visited Plaintiff while he was in the hospital, and told him to concentrate on himself and getting well and not to worry about his job because it was not in jeopardy.  (Philpot Dep. at 82-85; O'Halloran Dep. at 39-40).  While Plaintiff was in the hospital, NationsRent paid him for two weeks of vacation, and then he applied for and received short-term disability benefits.  (Philpot Dep. at 81; O'Halloran Dep. at 106; Doc. # 73, Ex. D).  These actions were consistent with NationsRent's FMLA policy.  (*Id.*).

### D.   Plaintiff's Return to Work

On or about September 6, 2001, Plaintiff's doctors released him to return to work part-time. (Philpot Dep. at 89; First Amended Complaint ¶ 26).  NationsRent allowed Plaintiff's wife to accompany him to work, allowed Plaintiff to work from a wheelchair, allowed Plaintiff to work from crutches, and allowed Plaintiff to work part-time.  (Doc. # 78, Ex. N).  Although Plaintiff worked only part-time once he returned to work, he received his full salary as soon as he returned to work. (First Amended Complaint ¶ 28; O'Halloran Dep. Ex. 2).

From September until late October or November, Plaintiff worked at the store approximately two to four hours a day and spent the remainder of his day at physical therapy.  (First Amended Complaint ¶ 29 and Ex. 1).  Plaintiff carried his NEXTEL and Southern Linc radios with him to physical therapy sessions so he could be contacted and communicate with others while not physically at the store location.  (Cornelius Dep. at 90).  From late October or November until March, Plaintiff worked at the store approximately four to five hours a day.  (First Amended Complaint ¶ 33 and Ex. 1).

Plaintiff was initially confined to a wheelchair, but sometime in late 2001, Plaintiff made the transition from a wheelchair to crutches.  (First Amended Complaint, ¶ 32; O'Halloran Dep. at 78-

6

79; Pl. Dep. at 95-96; Doc. # 78, Ex. K). He also wore a medically prescribed boot. (Pl. Dep. at 95-96; Doc. # 78, Ex. K). Plaintiff had limited ability to walk and experienced problems walking more than one hundred (100) to one hundred fifty (150) feet. (Doc. # 78, Ex. M). Plaintiff was allowed to use a gator or golf cart to move back and forth from the various yards located on the premises of Store No. 69. (Doc. # 78, Ex. O). By Christmas 2001, Plaintiff was able to walk without crutches, although he walked carefully on his injured foot, which resulted in a limp. (Cornelius Dep. at 86-87; O'Halloran Dep. at 79-80; First Amended Complaint, ¶ 34).

Plaintiff alleges that on one occasion in December 2001 or January 2002, Cornelius told Plaintiff to "hop on over here" and to "hobble on over here." (Pl. Dep. at 95). Cornelius also opined that it took Plaintiff more time to move around than other employees. (Cornelius Dep. at 88). Plaintiff did not report this comment or any concerns to Sean O'Halloran in human resources or anyone else at NationsRent while he was employed there. (Philpot Dep. at . 95-97).

No one at NationsRent expressed any problems with Plaintiff working part-time or discouraged Plaintiff from leaving work to attend physical therapy. (Philpot Dep. at 89-90). NationsRent did not have concerns about Plaintiff's ability to perform his job as Store Manager while he was working from a wheelchair or on crutches. (O'Halloran Dep. at 84-85). Plaintiff never officially requested any accommodation or assistance for his injury. (Philpot Dep. at 89-90; Cornelius Dep. at 94; O'Halloran Dep. at 64-65).

NationsRent's Position Statement to the EEOC states that Plaintiff received 32 weeks of leave (Doc. # 78, Ex. N), although NationsRent has produced no documentation evidencing Plaintiff's Family Medical Leave. (March 5, 2003 Deposition of Sean O'Halloran at 73-74).

Cornelius testified that he did not know that Plaintiff was on FMLA leave, although he sanctioned Plaintiff's time away from work for therapy.[5]  (Cornelius Dep. at 97-103).

### E.    Deficiencies at the Birmingham Store

In Fall 2001, Plaintiff received a copy of the 2002 financial projections for the Birmingham store.  (Philpot Dep. at 99).  Plaintiff believed at the time that the goals would be difficult to meet. (Philpot Dep. at 99-101).

During the first quarter of 2002, the Birmingham store was not meeting its financial projections; the store's net operating income was $-262,510, over $200,000 lower than projected. (Philpot Dep. at 124-25; Cornelius Dep. at122; Ex. J; Ex. M).  In addition to financial problems, there were problems with the organization of equipment and the cleanliness of the store.  (Philpot Dep. at 106-108, 118; Cornelius Dep. at 72-73).  Organization and cleanliness are important to a retail store because a messy store may give customers a bad impression of the store and the Company.  (Philpot Dep. at 69-70).

NationsRent also received complaints from managers of other stores and outside salespeople about the condition of the equipment received and rented from the Birmingham store.  (Philpot Dep. at 110-11; Cornelius Dep. at 72; Cornelius Declaration ¶ 10).   In early 2002, a large quantity of equipment in the yard of the Birmingham store was unaccounted for on any of the in-shop equipment reports, making it impossible to know what equipment was in inventory.  (Philpot Dep. at 126; Cornelius Dep. at 61-62).

---

[5] Although Plaintiff claims that Cornelius knew that Plaintiff had taken FMLA leave (Doc. # 77, at Fact No. 30), the evidence cited by Plaintiff does not support the assertion that Cornelius had knowledge of that fact.

Cornelius, who often spent two days a week or more at the Birmingham store, perceived a negative attitude among store employees. (Cornelius Dep. at 52, 92-93; Philpot Dep. at 102). Negative employee morale can adversely affect a retail store. (Philpot Dep. at 114).

To help improve the store's performance, Cornelius instructed Plaintiff to get out of his office and be more visible in the shop and to interact more with his employees. (Philpot Dep. at 115; Cornelius Dep. at 88, 95). Plaintiff and Cornelius also hired additional salespeople. (Philpot Dep. at 101). To help improve the district's performance, Cornelius implemented a central dispatch system which required that all large equipment repairs be sent to Birmingham in hopes that additional rental equipment would create additional revenue for the Birmingham store. (Philpot Dep. at 119-20; Cornelius Dep. at 41-42).

Cornelius also held a meeting with Plaintiff and the service manager, Bobby Lyle, in February 2002, to discuss the performance of the store, condition of the equipment and personnel issues. (Philpot Dep. at 106-08; Cornelius Dep. at 56-63; Lyle Declaration, ¶ 3). Cornelius instructed Plaintiff and Lyle to clean up the yard and organize the equipment. (Philpot Dep. at 106-08, 118; Cornelius Dep. at 59-62; Lyle Declaration, ¶ 3). Cornelius told them that if they could not do their jobs in accordance with his standards, then he would find somebody who could. (Lyle Declaration, ¶ 3; Cornelius Declaration, ¶ 7). Plaintiff was never issued written discipline until he was terminated. (Cornelius Dep. at 55-57, 65-67).[6]

_____

[6] Although Plaintiff maintains that NationsRent's Disciplinary Policy requires that "all disciplinary action must be documented on a Disciplinary Action Report that is signed by the issuing manager as well as the employee" (Doc. # 78, Ex. B), it is undisputed that Plaintiff was never issued written discipline. Rather, NationsRent maintains that its managers had verbal counseling sessions with Plaintiff regarding performance and other problems, which were sanctioned and even encouraged by the Disciplinary Policy. (Doc. # 78, Ex. B; 72).

During the first quarter of 2002, Cornelius was also dissatisfied with the performance of the Montgomery store. (Cornelius Dep. at 131-32). He held a meeting with the Montgomery Store Manager in February 2002, during which they discussed the manager's and the store's problems, including cleanliness and organization issues, and the need for immediate improvement. (Cornelius Dep. at 160-61). The manager of the Montgomery store resigned his employment shortly thereafter, on February 8, 2002. (Cornelius Dep. at 160-61). Additionally, because of the serious problems with its performance, NationsRent closed the Troy, Alabama store. (Cornelius Declaration, ¶ 5). Cornelius took no disciplinary action against any other Store Managers for missing budgeted revenue numbers for the first quarter of 2002. (Cornelius Dep. at 141-143).

### F.    Plaintiff's Termination

It is undisputed that from September 2001 through his termination in April 2002, Plaintiff was fully able to perform his job as Store Manager and was responsible for running the store. (Philpot Dep. at at124-25, 143).  By April 2002, Cornelius believed that Plaintiff was not implementing his suggestions for improving the performance and organization of the Birmingham store, and he decided to make a management change. (Cornelius Dep. at 51-53, 63).

The "last straw" for Cornelius was a complaint from Preston White at the Pelham store about the condition of rental equipment his location received from the Birmingham hub store. (Cornelius Declaration, ¶ 10). NationsRent terminated Plaintiff's employment on April 2, 2002. (Philpot Dep. at 143).   At his termination meeting, Cornelius informed Plaintiff that he was terminated for his performance problems and for performance issues related to his store. (Philpot Dep. at 130; Cornelius Dep. at 51-53, 142).

NationsRent has an Involuntary Termination Policy that states a manager "must" document the decision and complete a Personnel Action Form, accurately documenting the reasons for termination. (Doc. # 78, Ex. E). Plaintiff's termination form stated that he was discharged for "Performance," although Cornelius did not attach any documents to supplement this form. (Doc. # 78, Ex. G). NationsRent's Disciplinary Action Policy requires approval of the District Manager, Regional Human Resources Manager and Regional Vice President for the termination of an individual holding a salaried-management position. (Doc. # 78, Ex. B, D002214). The Regional Human Resources Manager and Regional Vice President did not sign Plaintiff's Personnel Action Form. (Doc. # 78, Ex. G).

### G.    Post-Termination Events

On the day after his termination, Plaintiff met with Sean O'Halloran, the human resources manager, to return NationsRent's property. (Philpot Dep. at 131-32). Plaintiff told O'Halloran that he "just felt that Wayne just based his decision on my performance pretty much." (Philpot Dep. at 132-33). Cornelius did not have a replacement for the Store Manager position when he terminated Plaintiff, and he ran the store himself while interviewing candidates. (Cornelius Dep. at133-34). Cornelius ultimately hired Chet Kelly, a new hire from outside NationsRent, for the position. (Cornelius Dep. at 134, 146). Nine months after Kelly was hired, Preston White, the Store Manager at NationsRent's Pelham location, was put into the position. (Cornelius Dec. at ¶ 11, Cornelius Dep. at 147). The Birmingham store continued to lose money in 2002 and 2003. (Cornelius Dep. at 134-136; Second O'Halloran Dep. at 111-115).

In September 2002, Plaintiff sought and received Social Security disability benefits. (Philpot Dep. at 149-150). Plaintiff stated that he sought Social Security disability benefits because he had

been unable to find a job and had a mortgage to pay and a wife and two kids to care for. (Philpot Dep. at 149-50). On his application for Social Security benefits, Plaintiff represented that he was physically unable to work in any capacity, and that he became unable to work on April 2, 2002—the date of his termination. (Ex. H; Philpot Dep. at 152). Plaintiff admitted that at the time he applied for Social Security disability benefits, he was physically able to perform a management job like the one he held with NationsRent. (Philpot Dep. at 152).

### III.   Applicable Substantive Law and Discussion

Plaintiff's claims in this case are asserted under the ADA and FMLA against NationsRent, his employer, and Cornelius, an individual Defendant.[7]

#### A.   Plaintiff's ADA Discrimination Claim Fails

The burden of proof with regard to an ADA claim is based on the *McDonnell Douglas* framework. *Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000). In order to state a prima facie case of disability discrimination under the ADA, Plaintiff must demonstrate that (1) at the time of the adverse employment decision, he was disabled or perceived as disabled; (2) he was otherwise qualified to perform the essential functions of the job, with or without a reasonable accommodation; and (3) he was subject to unlawful discrimination because of his disability (real or perceived). *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002); *Durley*, 236 F.3d at 657. Both NationsRent and Plaintiff agree that Plaintiff was able to perform the essential functions of his job.[8]

---

[7] Of course, Cornelius cannot be held individually liable under the ADA. *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996).

[8] Defendants argue that Plaintiff is estopped from asserting that he is a qualified individual with a disability in light of his representations to the Social Security Administration ("SSA") that he has been unable to work since the date of his termination. (Doc. # 72). The Supreme Court has

### i.   Plaintiff Is Not "Disabled" as Defined by the ADA

The ADA defines a disability as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual" or "being regarded as having such an impairment." 42 U.S.C. § 12102(2).   The court finds that Plaintiff has not established that he falls into either category.

Plaintiff argues that he is disabled under the ADA because his physical and medical condition substantially limited his major life functions of walking and working.   (Doc. # 77, citing to Doc. # 78, Exs. K, M and Cornelius Dep. at 85-88).   In particular, Plaintiff claims that he had difficulty walking more than one hundred to one hundred fifty feet (Doc. # 78, Ex. M), and that he was unable to move about the store with the speed and agility he had before his injury. (Doc. # 77).

Under the ADA, a physical impairment does not substantially limit the major life activity of working merely because it precludes the performance of one particular job. 29 C.F.R. § 1630.2(j)(3)(i). Instead, the impairment must significantly restrict "the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i).

---

made clear that a plaintiff must be able to explain any inconsistencies between his claim that he is unable to work for purposes of receiving SSA benefits and a seemingly contradictory claim that he is able to perform the essential functions of his job within the meaning of the ADA. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999).  In this case, Plaintiff has argued that his SSA benefits application did not provide for the concept of reasonable accommodation, and he completed that application based on his belief that he could not work without a reasonable accommodation, but could work when accommodated. (Pl. Decl. at ¶¶ 5, 8-9). The court finds that Plaintiff has satisfactorily explained any inconsistency between his application for SSA benefits and his contention he was able to perform his job with reasonable accommodation.

With respect to working, the Supreme Court has held that "the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege that they are unable to work in a broad class of jobs." *Sutton v. United Air Lines*, 527 U.S. 471, 491 (1999). Disqualification from working in a single job does not render the Plaintiff's condition a substantially limiting impairment; Plaintiff must prove that his condition precluded him from a "broad range of jobs." *Sutton*, 527 U.S. at 491, 493. Plaintiff has not discharged this burden. In this case, Plaintiff admitted that he was physically able to perform all of the essential functions of his job. (Pl. Dep 143, 152). Although Plaintiff used a wheelchair and crutches while his injury healed, it is undisputed that by Christmas 2001, Plaintiff walked without crutches, albeit with a slight limp. (Cornelius Dep. at 86-87; O'Halloran Dep. at 79-80; First Amended Complaint, ¶ 34). *See* 29 C.F.R. pt. 1630, App. § 1630.2(j) (1997) ("temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities"); *see also Sutton v. Ladder*, 185 F.3d 1203, 1208 (11th Cir. 1999). By December 2001 and through the date of his termination from NationsRent, the only restriction placed on Plaintiff by his doctor was to continue to elevate his foot throughout the day. (Pl. Dep. at 102-103, 137).

"Merely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002). In *Toyota*, the Supreme Court reversed the Sixth Circuit decision that found a former employee disabled because she could no longer perform all her manual tasks at work due to carpal tunnel syndrome and other similar conditions.[9] *Toyota*, 534 U.S. at 198. The Court held that "to be substantially limited in performing

---

[9]Plaintiff has not presented evidence that a walking impairment made him unable to perform a variety of tasks central to most people's lives. *Toyota*, 534 U.S. at 200-01. He has even fallen

14

manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Toyota*, 534 U.S. at 198. Specifically, the Court stated that "[w]hen addressing [a] major life activity . . ., the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." *Toyota*, 534 U.S. at 200-201.

In *Toyota*, the Court found that, despite her impairment, Plaintiff was not disabled, as indicated by her continued ability to "brush her teeth, wash her face, bathe, tend her flower garden, fix breakfast, do laundry, and pick up around the house." *Toyota*, 534 U.S. at 202. Although Plaintiff's condition did force her "to avoid sweeping, to quit dancing, to occasionally seek help dressing, and to reduce how often she plays with her children, gardens, and drives long distances," the court found that those changes in her life "did not amount to such severe restrictions in the activities that are of central importance to most people's daily lives that they establish a manual task disability as a matter of law." *Toyota*, 534 U.S. at 202.

In this case, Plaintiff has failed to make out a prima facie case under the ADA because he has not produced evidence to show that he is a "disabled" person under *Toyota* and its progeny. With

---

short of satisfying the less burdensome standard which was erroneously applied by the Sixth Circuit and rejected by the Supreme Court in *Toyota*; that is, he cannot show his impairment caused him to be unable to perform the tasks in his own job. No one at NationsRent expressed any concern about his working as a Store Manager even while he was in a wheelchair or on crutches (O'Halloran Dep. at 84-85), and there is certainly nothing in the record to suggest that after he began walking (even with a limp) Plaintiff was unable to perform his duties or that NationsRent was of the view that he was unable to do so.

respect to the major life activity of "walking,"[10] Plaintiff has not produced any evidence that his impairment substantially limited his activities outside of the workplace. Plaintiff has not shown that he cannot perform the types of tasks that are of central importance to daily life, such as those described by the *Toyota* court.   Although Plaintiff contends his ability to walk is limited in terms of distance and speed, walking with a limp or walking more slowly than usual is not sufficient to establish disability under the ADA. *See e.g., Kelly v. Drexel University*, 94 F.3d 102 (3d Cir. 1996) (finding no disability when plaintiff could not walk more than a mile, could not jog, walked slower on stairs and held a rail); *Graver v. Nat'l Engineering Co.*, 1995 WL 443944 (N.D. Ill. July 25, 1995) (finding no disability when plaintiff had a pronounced limp, could not walk on grass or other non-level surfaces and had significant pain while walking); *Penchishen v. The Stroh Brewery Co.*, 932 F.Supp. 671 (E.D. Pa. 1996) (finding no disability when plaintiff walked and climbed stairs slowly).[11]

### ii.    Plaintiff Was Not Regarded As Disabled

Likewise, Plaintiff has not presented sufficient evidence from which a reasonable fact-finder could determine that NationsRent *regarded* Plaintiff as disabled.  An employer regards an employee as disabled when: (1) it treats the impairment as substantially limiting when it is not; (2) the employer's attitude creates a substantial limitation; or (3) the employer treats the employee like he

---

[10] The Health Education & Welfare Rehabilitation Act regulations provide a list of examples of major life activities and "walking" is included in that list.  45 C.F.R. § 84.3(j)(ii).

[11] Even assuming the evidence presented by Plaintiff demonstrates that he was disabled shortly after his accident in the Fall of 2001, it fails to address whether he was disabled as the date of his termination in April 2002 – the decision he challenges as discriminatory. *See EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 379 (4th Cir. 2000) (assessing disability as of the time of the adverse action).

has an impairment when he does not. *Hilburn v. Murata Elec. North Am.*, 181 F.3d 1220, 1230

(11th Cir. 1999).

> The mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate that the employer regarded the employee as disabled. An employee who is perceived by his employer as having only a temporary incapacity to perform the essential functions of his job is not perceived as "disabled" as defined by the Act. *29 C.F.R. Pt. 1630, App. § 1630.2(j)* ("temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities"); *Huff v. UARCO, Inc.,* 122 F.3d 374 (7th Cir. 1997) (temporary condition not disability under the Act); *Sanders v. Arneson Products, Inc.* 91 F.3d 1351, 1354 (9th Cir. 1996) (plaintiff's four-month temporary impairment was too brief to be a "disability"); *Vande Zande v. Wisconsin Dep't of Administration,* 44 F.3d 538, 544 (7th Cir. 1995) ("intermittent, episodic impairments are not disabilities"); *Evans v. City of Dallas,* 861 F.2d 846, 852-53 (5th Cir. 1988) (knee injury not a disability).

*Sutton*, 185 F.3d at 1208.

Plaintiff's "regarded as" argument is summarized best by his comment that "no good deed goes unpunished." (Doc. # 77, at 5). Plaintiff argues that NationsRent's generous accommodations of his situation – allowing his wife to accompany him to work, allowing him to work from a wheelchair, allowing him to work from crutches, allowing him to work part-time and leave work early three days a week to attend physical therapy while still being paid full salary, and allowing him to use a gator or golf cart to move back and forth from the various yards located on the premises of Store No. 69[12] – somehow demonstrate that NationsRent perceived Plaintiff as disabled under the ADA. (Doc. # 77). Although NationsRent did allow Plaintiff to work under special circumstances, such evidence does not establish that NationsRent perceived Plaintiff's impairments as *substantially*

---

[12] Plaintiff disputes NationsRent provided him with the use of a gator for his sole use, (Pl. Dep. at 105-06), but there is no dispute that this accommodation was available to him.

limiting his ability to work.[13]  *See Gallagher v. Sunrise Assisted Living of Haverford*, 268 F.Supp.2d

436, 441 (E.D.Pa. 2003) (finding plaintiff was not regarded as disabled where employer made efforts

to minimize plaintiff's allergies by keeping pets away from plaintiff's desk and keeping plaintiff's

work area vacuumed and free of pet hair); *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 190 (3d

Cir. 1999) ("An employer may decide to accommodate people who are not 'disabled' under the

ADA."). Glaringly absent from the Rule 56 record is any evidence that NationsRent perceived

Plaintiff as unable to perform a class of jobs or a broad range of jobs, as required by the statute.  In

fact, after Plaintiff's accident, NationsRent returned Plaintiff to work in his same position with all

of the responsibilities that he held prior to his accident. *See e.g., Cash v. Smith*, 231 F.3d 1301,

1306-07 (11th Cir. 2000) (granting summary judgment on plaintiff's "regarded as" claims because

employer continued to employ plaintiff in position utilizing her skills).   Again, no one at

NationsRent expressed any concern about his working as a Store Manager even while he was in a

wheelchair or on crutches (O'Halloran Dep. at 84-85), and there is certainly nothing in the record

to suggest that after he began walking (even with a limp) Plaintiff was unable to perform his duties

or that NationsRent was of the view that he was unable to do so.

The court finds Plaintiff has failed to present sufficient evidence to allow a rational juror to

find him "regarded as" disabled under the ADA. Because Plaintiff has failed to establish that he is

---

[13] Plaintiff's argument that an isolated comment by Cornelius – "hop on over here" or "hobble on over here"– demonstrates that NationsRent regarded Plaintiff as substantially limited in his ability to work is without merit. (Pl. Dep. at 95). "It is difficult . . . to see how this statement evinces an erroneous or archaic attitude that would disadvantage someone wrongly suspected of being disabled." *Standard v. A.B.E.L.*, 161 F.3d 1318, 1328 (11th Cir. 1998).

"disabled" within the meaning of the ADA, his prima facie case fails and summary judgment is due to be granted on his discrimination claim for this reason alone.

### iii.    Plaintiff Has Not Demonstrated That Defendant's Articulated Reasons for Terminating Him are Pretextual

Even if Plaintiff could surpass his prima facie hurdle, he has not presented sufficient evidence to demonstrate that Defendants' articulated reasons for terminating his employment – poor performance and failure to meet objectives – are pretextual.

Defendants provide the following explanation for Plaintiff's termination. Cornelius, having been asked to "fix" the underperforming Birmingham hub store (Cornelius Dep. at 182-83), relied on Plaintiff for assistance because he was the Store Manager in Birmingham and the responsible person for the overall performance and financial health of the store. Cornelius observed numerous operational problems and warned Plaintiff and his service manager that these items needed to be improved or he would find someone else to fill their positions. (Lyle Declaration ¶ 3). Nonetheless, the Birmingham location continued to operate at financial losses and Cornelius continued to receive complaints from other stores and from outside salespersons about the condition of the equipment that they received from the Birmingham location. (Philpot Dep. at 106-111, 118, 126; Cornelius Dep. at 52, 61-62, 72-73, 92-93). After Cornelius received yet another complaint from a Store Manager about the condition of the equipment from the Birmingham store (Cornelius Dec., ¶ 10), he determined that Plaintiff was not implementing his suggestions for improving the performance and organization of the Birmingham store and decided to make a management change. (Cornelius Dep. at 51-53, 63). Plaintiff's employment was terminated April 2, 2002.

19

In an attempt to show pretext, Plaintiff first argues that Defendants' articulated reasons have been inconsistent. Plaintiff points out that Defendants have previously stated that the first quarter 2002 poor economic performance of the Birmingham store was the catalyst for Plaintiff's termination, while Defendants now claim that the "condition" of the Birmingham store and its equipment led to Plaintiff's termination.[14]  The court finds no inconsistency in the undisputed evidence. Defendants have consistently stated that Plaintiff was terminated for two reasons: (1) poor performance of the Birmingham store (as evidenced by the store's poor financial performance, the poor condition of the store's equipment, the lack of store cleanliness and organization, and the lack of employee motivation); and (2) Plaintiff's failure to comply with the directives of his manager for improving the store's performance.  (Doc. # 73, Ex. C-6, at 4).[15]  Even Plaintiff believed that his termination was a result of his performance.  He testified that, just one day after his termination, he "just felt that [Cornelius] just based his decision on my performance pretty much." (Pl. Dep. at 132-33).

---

[14] Remarkably, Plaintiff also alleges that Defendants' initial focus on *budgeted revenue* numbers in the Birmingham store is inconsistent with a later focus on an *operating income* number. Whether Defendants' arguments focus on one aspect of the financial analysis or another is not inconsistent with the stated reason of "poor performance."

[15] When asked why he terminated Plaintiff's employment at his deposition, Cornelius responded:

A:    Overall performance of the location, overall morale and confidence that the other locations had within the store. . . . . .
Q:    Is there anything else that you meant when you said "overall morale and confidence that the other stores had within" this location?
A.    It was a hub store, so those guys depended on that location at times.

(Cornelius Dep. at 51-52).

20

Next, Plaintiff argues that other stores in the district were also performing poorly, but other managers were not terminated. The undisputed evidence demonstrates, however, that Plaintiff's comparison of the Birmingham store to satellite stores is not relevant. Because the Birmingham store works with a higher volume of personnel and equipment and is responsible for providing equipment rentals and repairs to other locations, the court finds that it is not comparable to satellite stores such as Pelham.[16] Defendants point out that the proper comparator for the Birmingham hub store is the Montgomery hub store, a comparison dismissed by Plaintiff. It is undisputed that the Birmingham and Montgomery managers were treated similarly in the first quarter of 2002 – Cornelius held meetings with both of them to discuss performance problems and to offer suggestions for improvement.[17] (Philpot Dep. at 106-08; Cornelius Dep. at 56-63, 160-161; Lyle Declaration, ¶ 3).

_____

[16] Although Plaintiff also claims that he was replaced by White, a manager from the underperforming Pelham store, the undisputed evidence does not support that assertion. Cornelius had no replacement for Plaintiff and ran the store himself while he interviewed candidates. (Cornelius Dep. at 133-34) He ultimately hired Chet Kelly from outside NationsRent, not the Pelham manager as Plaintiff claims. (Cornelius Dep. at 134, 146). Although the Pelham manager *did* replace *Kelly* some nine months after Plaintiff's termination (Cornelius Dep. at 147), such a subsequent management change is not evidence of pretext in the April 2, 2002 decision at issue because, at best, Kelly – not White – was Plaintiff's replacement and, in any event, there is no evidence as to White's performance immediately before his 2003 transfer.

[17] Plaintiff seeks to demonstrate pretext by criticizing Cornelius' failure to recall his specific instructions to Plaintiff during this meeting. Plaintiff points out that the testimony of Cornelius is not as specific as his sworn declaration, which allegedly shows he is "reconstructing" the truth. These statements are not inconsistent; Cornelius described the same meeting using different terms and different levels of specificity. Regardless, Plaintiff does not dispute that Cornelius offered "concrete suggestions" for improvement to Plaintiff during a meeting prior to Plaintiff's termination. Plaintiff concedes that he "agree[s] that a meeting took place and during that meeting Cornelius gave. . .specific instructions about the organization and cleanliness of the yard." (Doc. # 77, at 20; Pl. Dep. at 106-08, 115; *accord* Cornelius Dep. at 61-63). Plaintiff even claims that he "took action to address Cornelius' concerns" and points to Lyle's testimony that he believed that the yard conditions had been corrected to the satisfaction of Cornelius. (Doc. # 77, citing Lyle Decl. at ¶¶ 12-14). Plaintiff is parsing words rather than pointing to real evidence of pretext.

21

The manager of the Montgomery store was not terminated because he abruptly resigned following his meeting, rather than attempt to make the improvements requested by Cornelius. (Doc. # 73, Ex. I, ¶ 7). Moreover, the undisputed evidence supports Cornelius' critical evaluation of Birmingham – Cornelius was specifically instructed to "fix Birmingham," and regardless, its problems were more apparent to Cornelius because his office was located there. (Cornelius Dep. at 72, 79-80, 92, 182-83).

Finally, Plaintiff claims that NationsRent's treatment of Plaintiff violated its own work policies. Standing alone, deviation from a company policy does not demonstrate discriminatory animus. *Mitchell v. USBI Co.*,186 F.3d 1352, 1355-56 (11th Cir. 1999); *see EEOC v. Texas Instruments Inc.*, 100 F.3d 1173, 1182 (5th Cir.1996) (finding that deviation from company policy is not evidence of discrimination, absent a nexus between deviation and employee's protected status); *Friedel v. City of Madison*, 832 F.2d 965, 973 (7th Cir.1987) (holding that inaccurate application of departmental policy not enough to prove discrimination); *see also Berg v. Florida Dep't of Labor and Employment Security*, 163 F.3d 1251, 1255 (11th Cir.1998) (finding that plaintiff failed to support claim of ADA violation by arguing that state agency had failed to apply its policies correctly, absent showing that policies were misapplied because of his disability). *Cf. Brown v. American Honda Motor Co.*, 939 F.2d 946, 952 (11th Cir.1991) ("It is difficult to hold that a practice which affects ... all races in the same manner is actually designed to conceal a racially discriminatory motive."). To establish pretext, a plaintiff must show that the deviation from policy occurred in a discriminatory manner. *Rojas v. Florida*, 285 F.3d 1339,1344, n.4 (11th Cir. 2002). Plaintiff cannot make such a showing and there is no evidence that "any deviation from [NationsRent's policies] in

this case ... constitute[s] evidence of pretext." *Walker v. Prudential Property and Cas. Ins. Co.*, 286 F.3d 1270, 1279 (11th Cir. 2002).

Regardless, the undisputed evidence indicates that NationsRent did not deviate from its policies. First, Plaintiff points to the absence of disciplinary documentation given to him, which he claims violates NationsRent's Disciplinary Action Policy. (Doc. # 78, Ex. B). The court finds that, although the policy includes specific requirements for written discipline, it advocates resolving performance problems in the "most informal and positive manner possible (e.g., through counseling . . . .)" and provides that counseling sessions need not be documented. (Doc. # 78, Ex. B). The undisputed evidence demonstrates that any meetings with Plaintiff were viewed as "coaching or counseling sessions," consistent with NationsRent's policies. (Doc. # 78, Ex. O, at 4-5). That Plaintiff was never formally "disciplined" is not evidence of pretext.[18]

The undisputed evidence demonstrates that NationsRent terminated Plaintiff because of his poor performance, even after counseling sessions, and the continual under-performance of the store for which he was responsible. The court finds that Plaintiff has not presented evidence of pretext sufficient to withstand summary judgment. Because Plaintiff cannot show that he was subject to any

---

[18] NationsRent's Employment Separations and Involuntary Termination policies also authorize termination for poor job performance after the administration of purely verbal discipline. The Separations policy states that, "[i]f an employee does not meet NationsRent standards for the job and does not respond to a manager's coaching, then termination via the Involuntary Termination Policy may be the only appropriate answer." (Doc. # 73, Ex. G). The Termination Policy confirms that involuntary terminations may be due to "poor job performance," and that the termination should "in most cases" be preceded by "verbal and/or written counseling sessions with the employee to help redefine goals. . . ." (Doc. # 73, Ex. G). Plaintiff also mistakenly claims that NationsRent's policies require several individuals to "all sign off on the termination." (Doc. # 77). In reality, the policies only require "approval" by these persons for terminations, not signatures. (Doc. # 78, Ex. B). But even if it can be said that NationsRent deviated from its policy, any deviation does not raise an inference of discrimination.

23

unlawful discrimination because of his disability or that his termination was in any way related to his physical condition, summary judgment is appropriate on this claim.

**B.    Summary Judgment Is Appropriate on Plaintiff's ADA Retaliation Claim**

The ADA also provides that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge ... under [the ADA]." 42 U.S.C. § 12203(a).[19]  To establish a prima facie case of retaliation, Plaintiff must show that he (1) engaged in protected activity, (2) NationsRent took an employment action adverse to Plaintiff, and (3) a causal link exists between the protected activity and the adverse action.  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998). Both parties agree that Plaintiff's termination was an adverse employment action.   However, Defendants argue that Plaintiff failed to engage in protected activity and that, regardless, no causal nexus exists between any protected activity and Plaintiff's termination.

Plaintiff argues that he engaged in protected activity by requesting and taking advantage of NationsRent's accommodations. The court is not convinced that this constitutes "protected activity" under the ADA.   The ADA's provision prohibiting retaliation provides, "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

---

[19] This provision creates a prohibition on retaliation under the ADA that is similar to Title VII's prohibition on retaliation. Accordingly, ADA retaliation claims are assessed under the same framework employed for retaliation claims arising under Title VII. *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1075-77 (11th Cir.1996) (relying on Title VII jurisprudence to interpret meaning of ADA provisions in a retaliation case).

The prohibition against retaliation in the ADA exists to protect employees who *complain* about an employer's treatment on the basis of disability; the prohibition against *discrimination* protects employees from adverse decisions on the basis of that classification. Plaintiff does not allege that he suffered an adverse action because he *complained* about treatment he received because of his disability. Instead he alleges discrimination under the ADA – *i.e.*, that he suffered an adverse action, termination, for being disabled and being given accommodations. It is undisputed that Plaintiff never opposed any "act or practice" that violated the ADA. In fact, there is no evidence that NationsRent ever denied Plaintiff *any* requested accommodations. To the contrary, the evidence suggests that NationsRent gave Plaintiff many *additional* accommodations that he never even requested. (Pl. Dep. at 89).

Moreover, the court finds meritless Plaintiff's contention that an inference of retaliation arises in this case because of the timing of his discharge in relation to his requests for accommodation. It is undisputed that Plaintiff's poor performance – as evidenced by complaints from other stores and continued financial decline of the Birmingham store – was in close temporal proximity to Plaintiff's termination. It is equally undisputed that Plaintiff was afforded multiple accommodations by NationsRent without any indication that NationsRent was in any way concerned about accommodating Plaintiff. "No inference of retaliation based on 'suspect timing' arises under these particular circumstances." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997). Plaintiff fails to create a question of fact on whether a causal connection

exists between an adverse action and any protected activity, and therefore summary judgment is appropriate on his retaliation claim under the ADA.[20]

### C.   Plaintiff Has Failed to Plead or Prove an FMLA Interference Claim

Congress created two causes of action under the FMLA: (1) claims based on interference with FMLA rights, such as improper denial of FMLA leave, and (2) claims based on an employer's retaliation or discrimination against an employee for exercising his rights under the FMLA. 29 U.S.C. § 2615(a)(1), (2).   In this case, Plaintiff has *alleged* only the latter – wrongful termination and retaliation in violation of the FMLA. (*See* First Amended Complaint (alleging only wrongful termination and retaliation in violation of the FMLA)).   FMLA interference claims are those in which "an employee asserts that his employer denied or otherwise interfered with his *substantive rights* under the Act." *Strickland*, 239 F.3d at 1206 (emphasis added).  Plaintiff has neither alleged that he was entitled to a right under the FMLA but denied it nor that his FMLA rights were interfered with.

Nonetheless, even assuming that an interference claim is part of this case, summary judgment is appropriate because Defendants provided Plaintiff with all of the benefits he was due under the FMLA.  The FMLA provides that a qualified employee is entitled to twelve weeks of unpaid leave each year in any twelve-month period to provide care for a newly born/ adopted child or for a family member who has a serious health condition or because that employee has a serious health condition that renders him unable from performing the functions of his job. 29 U.S.C. § 2612.  Leave may be

---

[20] Even if Plaintiff could surpass his prima facie hurdle, Plaintiff has not presented sufficient evidence to demonstrate that Defendants' articulated reasons for terminating his employment – poor performance and failure to meet objectives – are pretextual.  *See* discussion in Section III.A.iii. *supra.*

taken at a single time, intermittently, or on a reduced schedule. 29 U.S.C. § 2612(a)(1), (b)(1); 29 C.F.R. § 825.203.

Although it is unclear in this case whether Defendants actually designated Plaintiff's leave time as FMLA leave, the undisputed evidence indicates that Plaintiff received over twelve weeks of leave and, upon his return from his initial leave, was restored to his sales manager position – a position he retained until his termination more than six months later. Plaintiff was injured on July 28, 2001 and returned to work six weeks after the accident on September 6, 2001. Having utilized almost six weeks of FMLA leave upon his return to work (224 hours at 40 hours/week), Plaintiff had approximately 256 hours of leave remaining. Assuming that Plaintiff worked the maximum amount he claims – four hours a day until mid-October and then five hours a day until late December[21] – Plaintiff's leave was exhausted by December 28, 2001.

Plaintiff has not offered any evidence to refute that Defendants provided him with all of the substantive benefits that he was entitled to under the statute or otherwise interfered with any of his rights under the FMLA, including twelve weeks of protected leave and reinstatement. Plaintiff does quarrel with Defendants' calculations, although Plaintiff's arguments miss the mark. First, Plaintiff argues that Defendants' numbers exhaust Plaintiff's leave too early because Plaintiff actually "worked" during physical therapy by carrying a radio with him and being available to speak with NationsRent's employees. (Doc. # 77, at 14). The court lends no credence to this argument because

---

[21] Plaintiff claims that initially he worked approximately two to four hours each day. In early November, Plaintiff increased his work hours to four or five hours each day. By late-December of 2001, Plaintiff had reduced his physical therapy to only three days a week for three to five hours at a time, but continued receiving physical therapy through the time of his termination in April 2002. (Pl. Dep. at 98, 123). In its calculation above, the court has given Plaintiff the benefit of the doubt by assuming he worked four hours a day through early November.

the leave calculations are based on Plaintiff's *own allegations of hours worked* that were admitted by Defendants (First Amended Complaint, ¶¶ 29, 33; Answer, ¶¶ 29, 33), and were construed most favorably to him.

Plaintiff next argues that Defendants should be estopped from arguing that he was not on FMLA leave during March 2002, because Plaintiff *believes* that Defendants considered his entire leave as protected by the FMLA.  The Supreme Court has made clear that Defendants' failure to designate Plaintiff's leave time and reduced schedule as "FMLA leave" is of no consequence. Employees are not entitled to additional leave simply because the employer failed to designate the time.  *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 96 (2002).  Plaintiff's only case law support – a non-binding Eighth Circuit case – is distinguishable.  In that case, the court estopped the employer from arguing that Plaintiff's entire 34-week absence was not FMLA qualifying *only because* the employer had informed Plaintiff in writing that it considered all 34 weeks FMLA-covered.  *See Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 493-94 (8th Cir. 2002).  In this case, there is no documentation suggesting that Defendants considered Plaintiff on FMLA leave in March 2002, nor is there any letter to Plaintiff evidencing that NationsRent provided him more than twelve weeks of leave.  In fact, Plaintiff himself makes much of the fact that NationsRent has no documentation evidencing that Plaintiff took or received Family Medical Leave. (Doc. # 77).

The FMLA only mandates twelve weeks of leave, and the Supreme Court has rejected attempts to provide employees more protected leave than required by the statute.  *Ragsdale*, 535 U.S. at 96.  There is no evidence in the record to that NationsRent intended to extend Plaintiff's FMLA leave past twelve weeks, and therefore the court finds that Plaintiff exhausted his leave in

December 2001.[22]  Because Plaintiff has not demonstrated that Defendants failed to provide Plaintiff with the benefits due under the FMLA, summary judgment is appropriate on Plaintiff's FMLA interference claim.

**D.      Plaintiff Has Failed to Establish an FMLA Discrimination or Retaliation Claim**

Although Plaintiff's First Amended Complaint lists his discrimination and retaliation claims as two separate causes of action under the FMLA (*see* First Amended Complaint, at Counts One and Two), they raise the same issue – whether Plaintiff was wrongfully terminated because he took leave authorized by the FMLA. *Wascura v. City of South Miami*, 257 F.3d 1238, 1247-48 (11th Cir. 2001).  To establish a prima facie case, Plaintiff must demonstrate that (1) he availed himself of a right protected under the FMLA; (2) he suffered an adverse employment action; and (3) that there is a causal connection between the protected activity and the adverse action. *Graham v. State Farm Mutual Ins. Co.*, 193 F.3d 1274, 1283 (11th Cir. 1999).  Plaintiff must also present proof that NationsRent acted with discriminatory intent. *Strickland v. Water Works & Sewer Board of the City of Birmingham*, 239 F.3d 1199, 1206-07 (11th Cir. 2001).[23]

---

[22] Plaintiff's only "evidence" is an EEOC Position Statement, prepared by counsel months before the commencement of discovery in this case, that states Plaintiff received 32 weeks of leave. (Doc. # 77, at 14).  First, Plaintiff has taken this statement out of context.  Plaintiff ignores Defendants' statement, just two sentences later in the Position Statement, that Plaintiff exhausted all of his FMLA leave in December 2001. (Doc. # 78, Ex. N).  Moreover, the true evidence in this case – as opposed to statements of counsel related to other subjects – fails to demonstrate any intent by NationsRent to "extend" Plaintiff's FMLA leave past the time authorized by statute.

[23] Although Plaintiff's brief in opposition to summary judgment claims that he does not have to demonstrate discriminatory intent because he has alleged an "interference claim" (Doc. # 77, at 9), Plaintiff has confused his burdens and his claims.

Plaintiff's discrimination claim is based upon his termination from NationsRent, which he claims was in violation of the FMLA because the decision was based on his performance as Store Manager during the time that he was on intermittent leave. (Doc. # 77, at 9-10).[24] First, Plaintiff points to his supervisor's assurances while he was hospitalized that his job was not in jeopardy and that he should focus on his health – purportedly as evidence that Defendants promised Plaintiff he would not be disciplined. (Pl. Dep. at 82-83). Plaintiff's argument fails for two reasons. First, the undisputed evidence indicates that Plaintiff was *not* disciplined while on intermittent leave. NationsRent terminated Plaintiff in April 2002, at least three months after he had exhausted his FMLA leave. Second, although it is clear that taking FMLA leave cannot be used as a negative factor in disciplinary actions against an employee, 29 C.F.R. § 825.200(c), it is also clear that the FMLA does not shield an employee from performance-related discipline. 29 U.S.C. § 2614(a)(3)(B); *Dillon v. Carlton*, 977 F.Supp. 1155, 1160 (M.D. Fla. 1997), *aff'd*, 161 F.3d 21 (11th Cir. 1998). Statements of assurance made by Plaintiff's supervisors in mid-2001 cannot prohibit NationsRent from disciplining Plaintiff for poor performance nearly a year later. As discussed earlier, Plaintiff has failed to present sufficient evidence to demonstrate that his termination was based on anything *but* his performance. *See* Section III.A.iii *supra*.

Plaintiff also argues that temporal proximity between his FMLA leave and his termination suggest that a causal connection exists. (Doc. # 77, at 11). The parties disagree on the operative date for Plaintiff's protected activity in this case, a critical determination to the causal connection

---

[24] Although Plaintiff states generally that he was "disciplined" because of his FMLA leave, Plaintiff has not identified any alleged discriminatory or retaliatory action other than his termination on April 2, 2002.

analysis. Relying on "common sense" and cases from other circuits that look to the *last day* of protected activity, Plaintiff argues that his protected activity occurred up to and including March 2002, when he concluded his physical therapy and ended his reduced work schedule. (Doc. # 77, at 11-12). Relying on the Eleventh Circuit's opinion in *Wascura*, 257 F.3d at 1247-48, Defendants argue that Plaintiff's protected activity took place in July 2001, when Plaintiff *first notified* NationsRent that he would take leave. (Doc. # 72, at 11-12).

Application of Eleventh Circuit law clearly weighs in Defendants' favor because the date of leave notification occurred more than eight months before Plaintiff's termination in April 2002 – a period that has repeatedly been held to be too long to establish a causal connection. *See, e.g., Wascura*, 257 F.3d at 1247-48. However, even under Plaintiff's more liberal construction, he fails to establish temporal proximity. The last day of Plaintiff's protected activity occurred in December 2001, when Plaintiff exhausted his FMLA leave.[25] Even the four-month period of time between December 2001 and Plaintiff's termination in April 2002 is insufficient, alone, to establish a causal connection. *Wascura*, 257 F.3d at 1248 (concluding that three and one-half month period between notification of need to take FMLA and termination is insufficient for causal connection).[26]

---

[25] Plaintiff again argues that two pieces of evidence suggested Defendants considered Plaintiff to be FMLA- protected until March 2002: (1) Defendants' lack of documentation evidencing Plaintiff's leave as "FMLA leave," and (2) Defendants' "32 week" leave calculation in their EEOC Position Statement. (Doc. # 77, at 13-14). The court has already addressed the reasons why this so-called "evidence" is not sufficient to support his claims. *See* discussion *supra* footnote 18.

[26] The court also questions whether Cornelius, the decisionmaker with regard to Plaintiff's termination, even knew that Plaintiff had engaged in FMLA-protected activity. Although Plaintiff claims that Cornelius knew that Plaintiff had taken FMLA leave (Doc. # 77, at Fact No. 30), the evidence cited by Plaintiff does not support Cornelius' knowledge of that fact. Cornelius testified that he did not know that Plaintiff was on FMLA leave, although he sanctioned Plaintiff's time away

"The FMLA is not a shield to protect employees from legitimate disciplinary action by their employer if their performance is lacking in some manner unrelated to their FMLA leave." *Dillon*, 977 F.Supp. at 1160. For the reasons articulated in Section III.A.iii *supra*, Plaintiff has not shown that Defendants' articulated reasons for terminating Plaintiff are pretextual. Plaintiff's subjective belief that he was terminated because he took FMLA leave is insufficient as a matter of law to sustain his discrimination/retaliation claim, and summary judgment is appropriate.

## IV.    Conclusion

For the reasons stated above, Defendants' motion for summary judgment is due to be granted. The court finds that no genuine issues of material fact remain for trial and that Defendants are entitled to judgment as a matter of law. Defendants' motion to strike portions of Bobby Lyle's and Glen Shepherd's declarations is due to be denied. A separate Final Judgment will be entered.

**DONE** and **ORDERED** this 15th day of October, 2004.

_____

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

from work for therapy. (Cornelius Dep. at 97-103). Lack of knowledge of the decisionmaker is fatal to a retaliation claim. *See Clover v. Total System Serve.*, 176 F.3d 1346, 1354 (11th Cir. 1999) (demonstrating that it is the decisionmaker's awareness of the protected conduct that is essential to a retaliation claim).